**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

United States of America

    v.                                    Criminal No. 15-cr-178-LM
                                        Opinion No. 2016 DNH 039
Jose Casellas
Zakee Stuart-Holt
Jeannette Hardy


**O R D E R**


On June 22, 2015, Jeannette Hardy was assaulted by an unknown man as she attempted to enter her apartment building and then was shot by him as she escaped and ran outside. In the aftermath of the shooting, Hardy made statements to law enforcement officers and signed a consent form, authorizing them to search her apartment. While searching Hardy's apartment, which she leased with Zakee Stuart-Holt, officers discovered a large amount of what they believed to be heroin. Law enforcement officers subsequently executed a second search of the apartment after obtaining a warrant. Hardy and Stuart-Holt have been charged with conspiracy to distribute and possess with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a). Both Stuart-Holt and Hardy move to suppress evidence seized during the searches of the apartment. Hardy also moves to suppress certain statements she made following the shooting.

On January 14 and 15, 2016, the court held an evidentiary hearing on the motions to suppress.  At the hearing, the following Manchester Police Department ("MPD") police officers testified: Sergeants Michael Bergeron and Robert Bellenoit; Detectives Todd Leshney, Andrew Fleming, Derek Sullivan, Thomas DuBois, and Robert Tremblay; and Patrolman Shaun McKennedy. Hardy and Stuart-Holt also called two medical professionals: Dr. Michael Edwards, an emergency room physician, and Ann Berthiaume, a social work case manager.  The court held the record open for a week so that Hardy and Stuart-Holt could depose Dr. Robert Parisien, a physician who performed surgery on Hardy's hand.  Hardy and Stuart-Holt submitted a copy of Dr. Parisien's deposition to the court.  The court heard oral argument on the motions to suppress on January 22, 2016.

**FACTS**

I.   <u>The Shooting</u>

On June 22, 2015, Jeannette Hardy left her apartment building through the front door to walk her dog.  During the walk, Hardy spoke on the phone with Zakee Stuart-Holt, who was incarcerated at the Merrimack County House of Corrections ("MCHC").  While Hardy was out on her walk, an unknown man entered the front door of her apartment building.  When Hardy returned and stepped through the door to her building, the

2

unknown man attacked her.  Hardy was still on the phone with
Stuart-Holt at the time.  As Hardy attempted to flee, her
attacker shot her in the hand.  Hardy then ran down the street
to a convenience store.  A video surveillance camera that
captured the attack shows a timestamp of 9:07 p.m.

At about 9:08 p.m., the MPD received several 911 calls
reporting a gunshot and a woman screaming.  The MPD dispatch log
shows that police officers arrived at Hardy's apartment building
roughly two minutes later.  Emergency Medical Services ("EMS")
located Hardy at the convenience store.  At 9:22 p.m., EMS
transported Hardy to Catholic Medical Center in Manchester, New
Hampshire by ambulance.  Patrolman Shaun McKennedy accompanied
Hardy to the hospital.

Shortly after the shooting, officers contacted Hardy's
landlord, who informed them that Hardy lived in the second-floor
unit of a two-unit apartment building.  The first-floor unit was
unoccupied.  While standing outside the building in the
aftermath of the shooting, an officer reported seeing movement
in a window of the unoccupied first-floor unit.

At about 11:42 p.m., after conducting witness interviews
and an extensive investigation outside of Hardy's apartment
building, officers entered the building to look for Hardy's

attacker.[1]  They began by checking the empty first-floor
apartment and common attic and basement.  During the protective
sweep, officers used a dog that was trained to detect both
people and narcotics.  While clearing the attic, the dog alerted
to a box for a Keurig coffee maker.  The officer handling the
dog, Chad Tennis, noticed a strong odor of marijuana coming from
the box.  Tennis left the box in place.  The officers then
entered Hardy's second-floor apartment and completed the search
of the building.  No person was found in the building.[2]

II.  <u>Officers Obtain Consent to Search Hardy's Apartment</u>

In the meantime, Hardy was in the emergency room at the
hospital.  Hardy arrived at the hospital at 9:37 p.m.  Dr.
Michael Edwards examined Hardy at 9:45 p.m. and described her as
"emotionally upset."  At that time, a nurse noted that Hardy was
"anxious" and "in distress due to pain," but also found her
"cooperative [and] alert."  Hardy described her pain as sharp,
constant, and "10" on a scale of 1 to 10.  Hardy's medical

---

[1] The parties refer to the officers' search of the apartment
building to look for Hardy's attacker as the "protective sweep."
The court will use that phrase as well.

[2] Hardy's and Stuart-Holt's motions to suppress challenge
the seizure of the Keurig box and the legality of the protective
sweep.  The government states that it does not intend to
introduce the Keurig box or its contents at trial.  In light of
the government's position, Hardy and Stuart-Holt agree that the
seizure of the Keurig box and the legality of the protective
sweep are no longer at issue.

record shows that, at 9:50 p.m., the hospital gave her morphine
sulfate, which is a pain medication.  Side effects of that
medication include sleepiness and confusion.

At about 9:45 p.m., two officers from the MPD violent
crimes unit, Sergeant Michael Bergeron and Detective Todd
Leshney, joined McKennedy at the hospital.  When Bergeron and
Leshney arrived, Hardy was in the emergency room sitting upright
in a hospital bed, with blood on her clothes, and with her hand
bandaged.  McKennedy described Hardy as "handling [the
situation] very well."  Although Hardy was visibly upset and in
pain, McKennedy recalled that she was easy to speak to and could
recollect what had happened.

Hardy told Leshney and Bergeron that the attacker was
inside the common hallway of her apartment building when she
returned from her walk, and that she had a surveillance system
that would have captured the attack.  Hardy informed the
officers that the footage was stored on a digital video recorder
("DVR") located on a television stand in a bedroom of her
apartment.  During this conversation, Bergeron was "struck" by
how "calm" Hardy appeared.  Leshney informed Hardy that officers
at her apartment building were preparing to search the building
for her attacker.

About 15-20 minutes after he arrived at the hospital,
Leshney took a telephone call at the nurses' station from

someone claiming to be Hardy's husband.  Leshney asked the caller for his name several times before the caller hung up. Several minutes later, MCHC Sergeant Matthew Lamanuzzi called the nurses' station.  Lamanuzzi told Leshney that inmate Stuart-Holt was concerned for Hardy's welfare because Stuart-Holt was on the phone with Hardy when she was shot.  Leshney asked Lamanuzzi to have Stuart-Holt call him back on his cell phone. Leshney testified that he wanted to speak with Stuart-Holt to gather information about the shooting and the surveillance system.

After speaking with Lamanuzzi, Leshney and Bergeron asked Hardy for consent to search her apartment for evidence of the shooting and to collect the DVR.  Leshney presented Hardy with a standard MPD consent form that authorized officers to collect "any letters, papers, materials or other property which they may desire."  Hardy asked Leshney about the meaning of that phrase, and he told Hardy that their search of the apartment would focus on looking for evidence of the shooting and collecting the DVR. Leshney also explained that if Hardy did not consent to a search of her apartment, he would apply for a warrant.  Leshney explained that a judge might not approve the application, but if the judge did, the MPD would search her apartment pursuant to the warrant.  Hardy then signed the consent form at approximately 10:15 p.m.

At 10:18 p.m., Dr. Edwards described Hardy as "oriented to person, place and time," which means that she knew what time it was, who she was, and where she was.  In those same notes, Dr. Edwards indicated that Hardy's affect was "anxious," her judgment was "normal," her remote and recent memory were "normal," but her concentration was "poor."

At some point after Hardy signed the consent form, Stuart-Holt called Leshney's cell phone and asked to speak with Hardy. Leshney refused to allow Stuart-Holt to speak with Hardy because, as Leshney explained, he had a policy of prohibiting witnesses from speaking to one another during an investigation. Since Hardy was on the telephone with Stuart-Holt during the shooting, he did not want to permit them to speak to each other while the investigation was underway.  During the telephone call, Leshney asked Stuart-Holt about the DVR.  Stuart-Holt informed Leshney that the surveillance footage was stored off-site and could be accessed remotely.  After speaking with Stuart-Holt, Leshney determined that Stuart-Holt did not have useful information about the surveillance system because the information Stuart-Holt gave him directly contradicted specific and credible information he had obtained from Hardy. Additionally, Stuart-Holt did not know the login and password to access the system remotely and could not identify who had set up the system.

7

Leshney told Stuart-Holt that the police intended to enter the apartment to collect the DVR pursuant to Hardy's consent to search.  Stuart-Holt said nothing to indicate that he objected to the police entering the apartment.[3]

After Leshney spoke with Stuart-Holt, Hardy's landlord, Art Gatzoulis, who is also a criminal defense lawyer, arrived at the hospital and asked to speak with Hardy.  Gatzoulis informed the officers that he was there in his capacity as Hardy's landlord and not as her attorney.  After checking with medical staff, the detectives allowed Gatzoulis to meet privately with Hardy.

After Hardy met with Gatzoulis, Leshney asked both Hardy and Gatzoulis if they were "all set" with the consent to search. Hardy replied in the affirmative.  Gatzoulis made a noncommittal gesture which Leshney interpreted as "I'm not her lawyer, don't be asking me that."  McKennedy, Leshney, and Bergeron left the hospital at approximately midnight.

---

[3] Stuart-Holt submitted an affidavit which contradicts Leshney's version of the telephone call.  Stuart-Holt asserts that Leshney told him that he could not speak with Hardy because she was "too drugged up to speak with [him]."  In response, Stuart-Holt claims he stated: "If that's the case, I don't think it's appropriate for her to sign or consent to anything."  The court credits Leshney's account of his conversation with Stuart-Holt.

According to medical records, shortly after midnight, Dr. Suresh Pothuru evaluated Hardy for withdrawal from heroin.  Dr. Pothuru wrote that Hardy was "awake, alert, oriented," and answered all of his questions "appropriately."  He recommended that medical staff monitor Hardy for signs or symptoms of withdrawal and listed certain medications that could be administered as needed.

Hardy remained at the hospital overnight on June 22, awaiting surgery on her hand the next day.  No officers remained with Hardy overnight on June 22.

III.  The Search Pursuant to Hardy's Consent

At 2:16 a.m. on June 23, 2015, Leshney and Bergeron, along with several other members of the MPD, entered Hardy's apartment to search for evidence of the shooting and to collect the DVR pursuant to Hardy's consent.  While searching, the officers noticed "wads" of what appeared to be twenty- and hundred-dollar bills on a table in the living room, in a candle holder, and inside an open cardboard box.  Per MPD policy, the officers called a supervisor to oversee the process of counting and then securing the cash they located in Hardy's apartment.  The supervisor arrived at 2:31 a.m.

Officers also located the Keurig box to which the dog alerted during the protective sweep.[4]  They opened the box and found, among other items, marijuana, vials containing testosterone, hypodermic needles, scales, suboxone, and a pipe.

During the consent search, Detective Andrew Fleming was assigned to collect, bag, and label evidence.  Fleming collected the contents of the Keurig box.  He also located and collected the DVR on a TV stand in a bedroom, precisely where Hardy had described its location.  Additionally, Fleming collected several items from the top of the TV stand, some of which were consistent with personal use of narcotics (i.e., orange and pink pills that he believed to be narcotics), and noted that the TV stand was covered with an off-white powdery substance.

Fleming testified that, after the officers finished searching the apartment, he made one last "sweep" of the apartment, looking for gloves or other equipment the officers may have left behind while collecting evidence.  During his sweep of the room where he had located the DVR, Fleming noticed an open gray plastic shopping bag on the floor a few feet from

---

[4] Bergeron stated that the officers who had executed the protective sweep told the officers executing the consent search that a dog had alerted to the box that smelled strongly of marijuana in the attic.  Bergeron testified that the officers secured and inventoried the items in the box during the consent search.

the TV stand.[5]  Standing above the shopping bag, Fleming could
see that it contained Ziploc bags.  At least one of the Ziploc
bags was open and "sticking out" of the shopping bag.  Inside
the open Ziploc bag, Fleming could see off-white chalk-like
objects that "matched the same color" as the powder "residue" he
had observed on the TV stand.[6]  Once he made the connection
between the off-white residue on the TV stand and the chalk-like
items he observed in the shopping bag, he picked up the bag to
get a closer look and then exclaimed "uh-oh" -- as he realized
that "this was a lot of drugs . . . ."

    Fleming thought the drugs could provide a motive for the
shooting.  The officers field-tested the contents of the bag and
the result was "presumptive positive" for heroin.[7]  Having found
what they believed to be a large quantity of heroin, the

---

[5] In his affidavit, Leshney states that Fleming noticed the
bag while collecting the DVR.  On cross-examination, however,
Leshney stated that he did not "recall exactly how much time
after the DVR was disconnected that Detective Fleming made that
discovery."  The court credits Fleming's testimony on the
timing.

[6] Because the chalk-like objects were wrapped in several
layers of opaque wax paper, Hardy and Stuart-Holt argued that
Fleming could not have seen them from where he was standing.
Fleming credibly testified that he did, in fact, see them from
where he was standing, and photographs, see Exs. 19e and 19g,
corroborate that the chalk-like objects could be seen through
the opaque wax paper.

[7] As it turned out, the substance was fentanyl, a controlled
drug with properties similar to those of heroin.

officers stopped searching Hardy's apartment and sought a search warrant.

## IV. Hardy's June 23 Morning Statement

On June 23, between 8:00 a.m. and 10:00 a.m., detectives Derek Sullivan and Thomas DuBois, who specialize in narcotics investigations, went to the hospital to interview Hardy. Sullivan and DuBois wanted to investigate Hardy's source of supply because of the large quantity of drugs the officers found during the consent search.  When the detectives arrived, Hardy was sleeping, but she woke up when the detectives entered the room.  Prior to the detectives' arrival, a nurse's note indicated that Hardy was "anxious" and "overwhelmed."

Sullivan told Hardy that "if she was resting [they] would come back another time."  He also explained that Hardy was not under arrest, but that detectives were applying for a warrant to search her apartment because they found what they suspected to be heroin while performing the consent search.  Sullivan further explained that Hardy "would likely be charged with whatever drugs were found pursuant to that warrant."  He told Hardy that if she assisted with the investigation, he could recommend leniency to the prosecutor.  At some point, Hardy said "maybe I should speak to an attorney."  Sullivan testified that he told Hardy that speaking with a lawyer was "an option" and reiterated

that Hardy was not under arrest.  DuBois testified that they told Hardy that it was "certainly her right" to speak with a lawyer but that she "did not require one at that point."  Hardy agreed to talk to Sullivan and DuBois, and she then made incriminating statements.

Both Sullivan and DuBois testified that throughout their interaction with Hardy, she was alert and responded to their questions intelligently.  Sullivan testified that Hardy did not appear to be in extreme pain or visibly ill.  He described Hardy as "relaxed" and their interaction with her as "mellow."  DuBois described their interaction with Hardy as "cordial."  The detectives were wearing plain clothes and did not restrict Hardy's movement, although at one point they closed the door to her hospital room.  Hardy's roommate was in the room for some portion of the interview.  At around noon, Hardy appeared tired, so Sullivan and DuBois left the hospital.

After the detectives left, the medical records indicate that Hardy was prescribed klonopin "to help with anxiety."  A nursing note also indicates that Hardy was "anxious, tearful/crying, restless, [and] overwhelmed."  Earlier that morning, sometime before 11:38 a.m., Hardy met with Ann Berthiaume.  Hardy told Berthiaume that she had a ten-gram-per-day heroin addiction and that she was experiencing withdrawal symptoms.  Berthiaume noted that, at that time, Hardy's thoughts

were "normal," and her speech was "normal" and "coherent."
Berthiaume testified that Hardy was anxious, but was "otherwise
. . . able to communicate effectively."

V.   <u>Search Pursuant to a Warrant</u>

The police obtained a warrant to search Hardy's apartment
at approximately 2:00 p.m. on June 23, 2015.[8]  The warrant was
based in large part on information the police obtained during
the consent search.  Sullivan and DuBois briefly participated in
the warrant search, during which they located cash, and what
they believed to be heroin.  During the warrant search, officers
also seized a safe and records associated with a Bank of America
safety deposit box.

VI.   <u>Hardy's June 23 Afternoon Statement</u>

At about 2:30 p.m., Sullivan and DuBois returned to the
hospital.  They told Hardy about the cash and suspected heroin.
The detectives again informed Hardy that she was not under
arrest, and again Hardy agreed to speak with them and made
incriminating statements.

During the warrant search, Sullivan and DuBois recovered a
phone that Hardy had described to them earlier that morning.
They hoped to arrange for a delivery of drugs.  Sullivan

---

[8] The court will refer to the search of Hardy's apartment
pursuant to the warrant as the "warrant search."

testified that their interaction with Hardy was "calm" and "cordial."  DuBois testified that their interaction was "pleasant" and that he was "joking" with Hardy.  The detectives stayed at the hospital for approximately 90 minutes.  Some portion of that time was spent waiting for officers at Hardy's apartment to bring another cell phone to the hospital because Sullivan and DuBois had not retrieved the correct one.

Sometime before 4:00 p.m., medical staff informed the detectives that Hardy's surgery was approaching, and they prepared to leave.  On their way out, the detectives contacted their supervisor who, for the first time, informed them that an officer would stay with Hardy at the hospital and would arrest her if she tried to leave.  The detectives informed Hardy of the change in circumstances and told her that before they spoke with her again, they would first advise her of her Miranda rights.  See Miranda v. Arizona, 384 U.S. 436 (1966).  Then, as the detectives were about to leave, a nurse asked DuBois for help wheeling Hardy to surgery.  Dubois testified that he and Hardy joked while he helped the nurse transport her.  Sullivan took pictures of the scene with his cell phone.  Sullivan and DuBois then left the hospital.

Shortly before Hardy's surgery, Dr. Parisien dictated the following note:

> [Hardy] was found in her apartment with a large volume
> of cash and drugs and reported a gunshot wound to her
> hand . . . . The police have been involved and tell me
> that she is under arrest. . . . The police are here
> and they will go into the operating room with her.[9]

Dr. Parisien began Hardy's surgery at 4:00 p.m.  After her

surgery, at 4:44 p.m., medical records indicate that Hardy was

"alert and oriented" and "[c]alm and cooperative," but that she

complained of "significant anxiety regarding [her] current

situation and withdrawal symptoms."  A uniformed MPD officer

remained outside Hardy's hospital room throughout the night.

VII. Hardy's Waiver of Miranda Rights and Statements at the MPD
     on June 24, 2015

On June 24, Sullivan and Dubois arrived at the hospital at

9:30 a.m.  They remained in Hardy's hospital room as medical

staff gave Hardy discharge instructions and paperwork.  Hardy's

discharge instructions included a prescription for pain

medication and instructions to ice and elevate her hand.  Prior

to the detectives' arrival, medical staff noted that Hardy was

experiencing acute, continuous, throbbing pain in her right

---

[9] There are conflicting timestamps on the note.  One places
the note at 1:04 a.m. on June 23, the other at 10:30 p.m. on
June 23.  Dr. Parisien testified at his deposition that he did
not know how the time stamps worked at Catholic Medical Center
and that he had no memory of when he dictated the note.  See Ex.
S.  In light of the testimony that Hardy was placed in custody
just before she was taken into surgery at about 4:00 p.m. on
June 23, the court does not credit either timestamp on the note,
and finds that Dr. Parisien dictated the note shortly before
Hardy's surgery.

16

hand.  Because Hardy's clothes had been taken as evidence, the
detectives requested that hospital staff give Hardy scrubs to
wear instead of being released in a hospital gown.  Hardy was
discharged at 10:35 a.m.

The detectives then transported Hardy to the MPD.  During
the drive, Hardy was not handcuffed and sat in the front seat of
Sullivan's car.  On the way, Hardy asked the detectives to fill
her prescription for pain medication, but the detectives
declined because of a department policy prohibiting officers
from administering medication.

Once at the MPD, Sullivan and DuBois reviewed Hardy's
Miranda rights with her.  Sullivan asked Hardy if she had any
questions and Hardy did not.  Both Sullivan and DuBois testified
that Hardy appeared to understand the form.  DuBois testified
that Hardy did not appear to be under the influence of any
medication.  Hardy then signed a Miranda waiver form at 10:58
a.m.

Sullivan and DuBois debriefed Hardy until about 12:40 p.m.
During her debriefing, Hardy made incriminating statements.
Hardy then started making calls to arrange for a delivery of
drugs.  Hardy spent most of her time at the MPD that afternoon
sitting in an interview room and waiting as she and the
detectives attempted unsuccessfully to arrange controlled drug
deliveries.  Hardy remained at the MPD until 8:45 p.m.

During the day, Sullivan and DuBois offered Hardy food, but she declined.  They also took Hardy outside for cigarette breaks.  The detectives asked Hardy about her pain throughout the day and Hardy told them it was "not too bad."  Sullivan testified that their interaction was "very relaxed."  Sullivan also testified that, through his work as a drug investigator, he had seen people go through withdrawal and Hardy did not appear to have symptoms of withdrawal.

## DISCUSSION

Hardy filed two motions to suppress.  In the first (doc. no. 19), she seeks to suppress the statements she made at the hospital on June 23, 2015, and those she made at the MPD on June 24, 2015.  In the second (doc. no. 20), Hardy seeks to suppress evidence seized during the searches of her apartment. Stuart-Holt's motion (doc. no. 22) also seeks to suppress the evidence seized during the searches of Hardy's apartment.[10]  The government objects to all three motions (doc. no. 26).

The court first examines the motions to suppress the evidence seized during the searches of Hardy's apartment and then turns to the motion to suppress her statements.

---

[10] The government concedes that Stuart-Holt, as a co-tenant, has standing to move to suppress the evidence seized during the searches of the apartment.

I.   <u>The Consent and Warrant Searches</u>

Hardy and Stuart-Holt argue that both the consent search and warrant search were unlawful and, therefore, evidence seized from each of the searches must be suppressed.[11]  The court addresses each search separately.

A.   <u>The Consent Search</u>

Hardy contends that evidence seized during the consent search should be suppressed because she did not give valid consent to the search and, even if she did, the search exceeded the scope of her consent.  Stuart-Holt adopts Hardy's arguments, and also contends that the consent search was unlawful because the MPD failed to obtain his consent before conducting it.

1.   <u>Validity of Consent</u>

"Consent is an 'established exception[ ]' to the Fourth Amendment warrant requirement."  <u>United States v. Casellas-Toro,</u> <u>807 F.3d 380, 391 (1st Cir. 2015)</u> (quoting <u>Schneckloth v.</u> <u>Bustamonte, 412 U.S. 218, 219 (1973)</u>).  "In order for consent to be valid, the Government must prove by a preponderance of the evidence that the consenting party gave it freely and

---

[11] Their motions also challenge the legality of the protective sweep, which preceded the consent and warrant searches.  In light of the government's decision not to introduce the Keurig box or its contents at trial, however, Hardy and Stuart-Holt concede that the legality of the protective sweep is a moot question.

voluntarily." United States v. Jones, 523 F.3d 31, 37 (1st Cir. 2008).  "Consent is voluntary if it is the product of an essentially free and unconstrained choice."  United States v. Chhien, 266 F.3d 1, 7 (1st Cir. 2001) (internal quotation marks omitted).  "To determine whether consent was voluntary, [the court] examine[s] the totality of the circumstances, which may include consideration of the defendant's 'age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics.'"  United States v. Hinkley, 803 F.3d 85, 91 (1st Cir. 2015) (quoting United States v. Chaney, 647 F.3d 401, 407 (1st Cir. 2011) (further citations omitted)).

Hardy argues that her consent was not valid because the police obtained it through coercion.  Hardy contends that: (1) she consented to the search only because the officers told her they would get a warrant if she did not consent, even though the officers lacked probable cause to get a warrant; (2) the officers misrepresented the purpose of seeking consent to search her apartment, telling her that they were investigating the shooting when they were actually investigating drug crimes; and (3) her physical and mental condition at the hospital was so limited that she was unable to provide knowing and voluntary consent.  None of Hardy's contentions is supported by the evidence.

a. Officer's Statement to Hardy About Securing a
   Search Warrant

Hardy asserts that her consent to search was coerced
because she gave consent only after Leshney stated that the
officers would get a search warrant if she did not consent,
which Hardy contends was a false statement.  "[C]onsent to a
search is invalid if given only because of an officer's
knowingly false assurance that there will soon be a lawful
search anyway." United States v. Vázquez, 724 F.3d 15, 22 (1st
Cir. 2013).  On the other hand, "consent to a search is not
invalid merely because it is secured by an officer's accurate
assurance that there will soon be a lawful search anyway."  Id.

"[A] law enforcement officer's application for a search
warrant must demonstrate probable cause to believe that a crime
has been committed" and that "enumerated evidence of the offense
will be found at the place to be searched." United States v.
Cordero-Rosario, 786 F.3d 64, 69 (1st Cir. 2015) (internal
quotation marks omitted).  "For probable cause to exist, the
facts presented to the magistrate need only warrant a man of
reasonable caution to believe that evidence of a crime will be
found." United States v. Soto, 799 F.3d 68, 84 (1st Cir. 2015)
(internal quotation marks omitted).

Hardy contends that Leshney knew that the officers lacked
probable cause to obtain a search warrant.  The government

21

asserts and the record shows, however, that the officers had ample probable cause to support an application for a search warrant.

Hardy told the officers that she had a surveillance system that would have captured the attack, and that the footage was stored on a DVR located in her apartment.  In light of Hardy's statement, the officers could have reasonably believed that they had probable cause to get a warrant to search Hardy's apartment for the DVR and any other evidence of the shooting.  Therefore, any representation by Leshney that the officers would get a search warrant if Hardy withheld consent does not render Hardy's consent invalid.[12]  See Hinkley, 803 F.3d at 91 ("consent to search is not invalid where procured by an officer's reasonable assessment that there would be a legal search anyway") (citing Vázquez, 724 F.3d at 22-25).

In addition, Hardy's version of events is inaccurate. Leshney told Hardy that if she did not consent to a search of her apartment, he would apply for a warrant.  He explained that a judge might not approve the application, but if the judge did,

---

[12] Hardy points to Stuart-Holt's statement to Leshney that the surveillance system footage was stored off-site and could be accessed remotely as evidence that Leshney could not have believed the officers had probable cause to obtain a search warrant to search for the DVR.  As explained above, however, Leshney reasonably concluded that Stuart-Holt's statements concerning the DVR were not credible and/or helpful.

the MPD would search Hardy's apartment pursuant to the warrant.
Therefore, no coercion occurred.[13]  See United States v. Hinkley,
No. 2:13-cr-0049-NT, 2014 WL 119293, at *11 (D. Me. Jan. 10,
2014) ("[I]t is not police coercion to inform an individual what
the likely consequences will be if the individual refuses
consent, thereby providing context for the individual's
decision, but [] it is police coercion to obtain consent by
tricking an individual into falsely believing a search is
inevitable and that declining consent would be futile.").

     Therefore, Leshney's statements concerning applying for a
search warrant in the event that Hardy withheld consent does not
establish coercion.

### b. Purpose of Seeking Consent

     Hardy asserts that Leshney and Bergeron misrepresented the
purpose of the consent search.  She argues that prior to
obtaining her consent, the officers falsely assured her that
they wanted to search her apartment to investigate the shooting

---

[13] Hardy cites Vázquez, 724 F.3d at 19-20, in support of her
argument.  Vázquez is not applicable to the facts in this case.
In Vázquez, an FBI agent asserted he had authority to conduct a
warrantless search of the defendant's apartment if she did not
consent to the search.  See id.  Here, Leshney advised Hardy of
her right not to consent, and informed Hardy that the officers
would apply for a warrant if she refused, but did not state that
the warrant would be granted.  Unlike the officer in Vázquez,
Leshney did not assert that he had the authority to search the
defendant's home regardless of her consent.

rather than admit that the real purpose was to look for drugs.
Hardy points to the discovery of the Keurig box during the
protective sweep and to the fact that the officers did not view
the surveillance footage of the attack until several weeks after
the search.  According to Hardy, the MPD's discovery of the
Keurig box and lack of interest in the footage raises the
inference that the officers' focus in seeking to search her
apartment was to search for narcotics, not to collect the
surveillance footage or look for evidence related to the
shooting.

The evidence shows, however, that the purpose of seeking
Hardy's consent to search was to investigate the shooting.  Both
Bergeron and Leshney, the officers who questioned Hardy at the
hospital and obtained her consent, worked in the MPD violent
crimes unit.  Prior to obtaining her consent, Bergeron and
Leshney questioned Hardy only about the shooting, and did not
mention narcotics.  The evidence shows that the officers were
investigating the shooting before and during the consent search,
and that the focus of the investigation changed only <u>after</u>
Fleming discovered the shopping bag full of drugs in Hardy's
bedroom.[14]  Therefore, the fact that the MPD did not view the

---

[14] The officers who specialize in narcotics investigations,
Sullivan and DuBois, became involved in the investigation at
that point, when the focus switched to narcotics.

surveillance footage until weeks later, after the focus of the investigation had changed, does not support Hardy's contention that the officers misrepresented the purpose of seeking her consent to search.[15]

In short, the officers did not misrepresent the purpose of the consent search.

### c. Hardy's Physical and Mental Condition

Finally, Hardy argues that because of her physical and mental condition at the time she gave consent, her consent was not knowing or voluntary.  When Hardy consented to the search of her apartment, she was receiving treatment for the gunshot wound to her hand, including pain medication.  Hardy's pain was intense; she described experiencing a pain level of "10" on a scale of 1-10.  The medical records and testimony from the officers who obtained Hardy's consent, however, show that despite her pain Hardy was coherent, alert, and answering questions intelligently.  Hardy's questions seeking clarification of certain parts of the consent form also show her

---

[15] Hardy's suggestion that the discovery of the Keurig box during the protective sweep changed the focus of the MPD's investigation is not supported by the evidence.  At the time the officers obtained Hardy's consent, they had not yet conducted the protective sweep or discovered the Keurig box.  Even if they had, there is no evidence in the record that Bergeron or Leshney were aware of the Keurig box or its contents at the time they procured Hardy's consent.

ability to understand and comprehend.  See United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009) (upholding district court's finding of valid consent to search where defendant, who "spoke only broken English," told the officer twice that "he did not understand a particular question, showing that he usually did understand, but when he did not, he was willing to say so"); see also United States v. Osborne, 662 F. Supp. 2d 1306, 1314 (M.D. Ala. 2009) (consent to search was not coerced and was voluntary where, although defendant was "upset and sometimes tearful during the interview, he freely asked questions and received clarification").  The evidence establishes that Hardy was capable of consenting to the search.

The government has, therefore, carried its burden to show that Hardy knowingly, voluntarily, and intelligently consented to a search of her apartment.

### 2.  Scope of Consent

Hardy contends that evidence seized during the consent search should be suppressed because the officers exceeded the scope of her consent, which was limited to obtaining the surveillance footage.  "Warrantless searches may not exceed the scope of the consent given.  The scope of consent is measured by a test of objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the

officer and subject?'"  United States v. Marshall, 348 F.3d 281, 286 (1st Cir. 2003) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).  "[Courts] therefore look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions."  Id. at 286-87 (internal quotation marks and citation omitted); see also Casellas-Toro, 807 F.3d at 391.

The MPD consent form that Hardy signed authorized the officers to collect "any letters, papers, materials or other property which they may desire."  However, in response to Hardy's question about that language, Leshney explained that the search of her apartment would focus on looking for evidence of the shooting and collecting the DVR.  A reasonable person would have understood that Hardy consented to a search of her apartment to recover the DVR and to look for any evidence related to the shooting.

Hardy contends that the MPD's seizure of the shopping bag full of drugs went beyond the scope of her consent.  The court finds, however, that the seizure of the shopping bag was permissible under the plain view exception.

"The theory of [the plain view] doctrine consists of extending to nonpublic places such as the home, where searches and seizures without a warrant are presumptively unreasonable, the police's longstanding authority to make warrantless seizures

27

in public places of such objects as weapons and contraband."
Arizona v. Hicks, 480 U.S. 321, 326–27 (1987) (citing Payton v.
New York, 445 U.S. 573, 586–87 (1980)).  "[T]he plain view
doctrine permits the warrantless seizure of an item if the
officer is lawfully present in a position from which the item is
clearly visible, there is probable cause to seize the item, and
the officer has a lawful right of access to the item itself."
United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015).  In
this context, "probable cause exists when the incriminating
character of an object is immediately apparent to the police."
United States v. Sanchez, 612 F.3d 1, 5 (1st Cir. 2010).

At the evidentiary hearing, Hardy conceded that, to the
extent the officers were lawfully in her apartment at the time,
both the money and evidence of personal narcotics use were in
plain view.  And, it is undisputed that the open shopping bag
was clearly visible from the entrance to the bedroom where the
DVR was located.[16]  The shopping bag was on the floor between the
bed and the TV stand where the DVR was stored.  Hardy contends
that the incriminating nature of the bag was not immediately
apparent.

"[An] officer need not be certain of the incriminating
character of an object, but, rather, must have a belief based on

---

[16] A photograph of the room conclusively established that
fact.  See Ex. 17i.

28

a 'practical, nontechnical probability' that the object is evidence of a crime." United States v. Paneto, 661 F.3d 709, 714 (1st Cir. 2011) (quoting United States v. Giannetta, 909 F.2d 571, 579 (1st Cir. 1990)). "[T]he use of the phrase 'immediately apparent' [in Coolidge v. New Hampshire, 403 U.S. 443 (1971)] was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Texas v. Brown, 460 U.S. 730, 741 (1983). The doctrine requires only that an officer have probable cause in its ordinary sense before seizing an incriminating item. Minnesota v. Dickerson, 508 U.S. 366, 376 (1993).

Here, prior to picking up the shopping bag, Fleming had ample probable cause to believe the bag contained contraband. Fleming testified that he could see that the shopping bag contained a Ziploc bag within which he could see chalk-like objects that had an off-white color similar to the color of the powder residue on top of the TV stand. Viewed in the context of the wads of cash and other evidence of narcotics use in the apartment, there was more than a "practical, nontechnical probability" that the bag contained an illegal substance.

Hardy argues that the incriminating nature of the bag only became apparent to Fleming after he picked it up and looked

inside it.  However, Fleming credibly testified that before he picked up the bag, he could see a Ziploc bag, as well as the off-white chalk-like objects inside it.[17]  When Fleming exclaimed "uh-oh" after picking up the shopping bag, he was expressing shock at the quantity of drugs in the bag, rather than shock at the presence of drugs in it.  An officer is permitted to examine an item more closely to confirm his belief that an item is contraband.  See Paneto, 661 F.3d at 714 (officers had probable cause to seize a $20 bill, which was evidence of a crime, despite not being able to confirm the incriminatory nature of the bill until after the officer picked it up, turned it over, and observed the incriminating mark); see also Brown, 460 U.S. at 746 (Powell, J., concurring) (experienced officer recognized that an innocent-looking party balloon was knotted in a fashion commonly used to package heroin); United States v. Johnston, 784 F.2d 416, 421 (1st Cir. 1986) (experienced officer recognized adding machine tapes and written notations as drug related).  Moreover, in light of the unique set of facts, Fleming's act of

---

[17] To be clear, the court found Fleming to be a credible witness in every respect.  He conceded that his realization that the bag contained a large quantity of drugs was a fluid process. However, he did not waver on the critical fact that, before picking up the shopping bag, he could see chalk-like objects that "matched" the color of residue on the TV stand inside an open Ziploc bag within the shopping bag.  This testimony establishes more than enough probable cause for Fleming to seize the shopping bag.

picking up the shopping bag may not have constituted a search at
all. See id. at 714 n.3 ("Under Hicks, it is clear that the
Fourth Amendment forbids handling an item to expose something
hidden, but it is far from clear that the Fourth Amendment
prohibits moving an item merely to magnify or confirm something
already visible.").

In short, the officers were permitted to search for any
evidence of the shooting, and for the DVR, which was located on
a TV stand in Hardy's bedroom. Fleming observed the shopping
bag full of drugs in plain view as the officers were concluding
their lawful search and preparing to leave. Therefore,
Fleming's seizure of the shopping bag was not unlawful.

### 3.   Necessity of Stuart-Holt's Consent

Stuart-Holt argues that the consent search was unlawful
because the MPD failed to obtain his consent. He contends that
because he was a co-tenant, the MPD could not conduct a consent
search without procuring both his and Hardy's consent.

In general, the "consent of one who possesses common
authority over premises or effects is valid as against the
absent, nonconsenting person with whom that authority is
shared." United States v. Matlock, 415 U.S. 164, 170 (1974).
"Common authority" rests on "mutual use of the property by
persons generally having joint access or control for most

purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Georgia v. Randolph, 547 U.S. 103, 110 (2006) (quoting Matlock, 415 U.S. at 171 n.7 (internal quotation marks omitted)).

Here, Hardy and Stuart-Holt both rented the apartment that was subject to the consent search. Therefore, Hardy and Stuart-Holt both had common authority to consent to a search of the apartment. Once the officers obtained Hardy's consent, they were not required to also obtain Stuart-Holt's consent in order to proceed with the search.[18]

The government has carried its burden to show that Hardy's consent was voluntary, knowing, and intelligent, and that her consent alone, without Stuart-Holt's, was sufficient to allow the MPD to conduct a warrantless search. The government has

---

[18] Stuart-Holt asserted at the hearing that he affirmatively objected to the search while on the phone with Leshney. The evidence in the record, including Stuart-Holt's affidavit, does not support that assertion and the court finds that he did not object while on the telephone with Leshney. Even if the court agreed with Stuart-Holt that he interposed an objection while on the telephone with Leshney, such a finding would not negate Hardy's consent. See Fernandez v. California, 134 S. Ct. 1126, 1133-36 (2014) (noting that under Randolph, a warrantless search done on the basis of an occupant's consent may be unreasonable if a co-occupant objects to the search, but the "holding [is] limited to situations in which the objecting occupant is [physically] present").

also carried its burden to show that the search did not exceed
the scope of Hardy's consent.  Therefore, Hardy's and Stuart-
Holt's motions to suppress evidence seized during the searches
of their apartment are denied to the extent they seek to
suppress evidence seized during the consent search.

     B.   The Warrant Search

     Hardy contends that evidence seized during the warrant
search should be suppressed because without information
unlawfully gained during the consent search, the affidavit and
warrant for the warrant search lacked probable cause.  For the
reasons discussed above, the consent search was lawful.
Therefore, any information gained during that search which was
used as a basis for either the affidavit or the warrant was not
improperly collected.  Casellas-Toro, 807 F.3d at 392 (court's
determination that first search was valid disposes of
defendant's argument that subsequent search warrant lacked
probable cause because it was based on information gleaned from
the first search).[19]

---

[19] Hardy also asserts an argument under Franks v. Delaware,
438 U.S. 154, 172 (1978), based on what she alleges were false
statements (or omissions) in the search warrant affidavit.  This
argument is meritless as the affidavit contains no false
statements.  Moreover, were the court to excise the alleged
false statements from the affidavit, there would remain ample
probable cause to support the warrant.

Accordingly, Hardy's and Stuart-Holt's motions to suppress evidence seized during the searches of their apartment are denied.

II.  <u>Hardy's Statements at the Hospital and at the MPD</u>

Hardy seeks to suppress the statements she made to Sullivan and DuBois at the hospital on June 23, 2015, and at the MPD on June 24, 2015.  Hardy asserts that she should have been, but was not, given <u>Miranda</u> warnings prior to making her statements at the hospital on June 23.  She also argues that, although she was advised of and waived her <u>Miranda</u> rights prior to making incriminating statements at the MPD on June 24, her waiver was not valid.  Hardy further contends that regardless of her <u>Miranda</u> arguments, both her statements should be suppressed because they were not voluntary.

A.  <u>Failure to Provide Miranda Warnings at Hospital</u>

Hardy contends that she was in custody while she was in the hospital, which triggered the requirement of <u>Miranda</u> warnings. She argues that the officers' failure to give her warnings requires suppression of the statements she gave them.

"Law enforcement officers must give <u>Miranda</u> warnings before interrogating an individual who is 'taken into custody or otherwise deprived of his freedom of action in any significant way.'" <u>United States v. Infante</u>, 701 F.3d 386, 396 (1st Cir.

2012) (quoting Stansbury v. California, 511 U.S. 318, 322 (1994)
(per curiam)).  Determining whether an individual is in custody
for the purposes of Miranda "involves two distinct inquiries:
'first, what were the circumstances surrounding the
interrogation; and second, given those circumstances, would a
reasonable person have felt he or she was not at liberty to
terminate the interrogation and leave.'"  Infante, 701 F.3d at
396 (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)).
When medical treatment prevents an individual from leaving, the
second inquiry becomes: was the individual "at liberty to
terminate the interrogation and cause the officers to leave"?
Infante, 701 F.3d at 396 (internal quotation marks and
alteration omitted).

     To determine whether an individual is in custody for the
purposes of Miranda, the court considers the totality of the
circumstances.  Infante, 701 F.3d at 396.  In considering the
totality of circumstances, the following factors guide the
court's analysis: "whether the suspect was questioned in
familiar or at least neutral surroundings, the number of law
enforcement officers present at the scene, the degree of
physical restraint placed upon the suspect, and the duration and
character of the interrogation."  Id. (quoting United States v.
Hughes, 640 F.3d 428, 435 (1st Cir. 2011)).  "It bears emphasis
that the determination of whether custody exists 'depends on the

objective circumstances of the interrogation, not on the
subjective views harbored by either the interrogating officers
or the person being questioned.'" Hughes, 640 F.3d at 435
(quoting Stansbury, 511 U.S. at 322).  Here, considering the
relevant factors, the government has shown by a preponderance of
the evidence that Hardy was not in custody when she was
questioned by Sullivan and DuBois at the hospital.

     First, the evidence shows that Hardy's hospital room was a
neutral setting.  Although a police officer accompanied Hardy to
the hospital, the MPD was not involved in her hospitalization
and did not interfere in any way with her care or extend her
hospital stay.  See United States v. Martin, 781 F.2d 671, 673
(9th Cir. 1985) (fact that officers were not involved in the
defendant's hospitalization and did nothing to extend the
defendant's hospital stay weighed in favor of a finding that the
defendant was not in custody).  Hardy was interviewed in her
hospital room with a roommate present for at least some portion
of the interview.  Furthermore, hospital staff came and went
during the questioning, and the officers left in the morning
when Hardy appeared tired and in the afternoon when hospital
staff told them Hardy needed to prepare for surgery.  See
Infante, 701 F.3d at 397 ("hospital staff came and went freely
during the course of the interviews, suggesting that the
officers were not in a position to dominate the setting as they

are, for example, [in] an interrogation room at a jailhouse")
(internal quotation marks and brackets in original omitted).
These facts, taken together, show that the hospital was "at
least a neutral setting."  Id.

Second, the number of law enforcement officers present
weighs in favor of finding that Hardy was not in custody during
the hospital interviews.  During the interviews on June 23, only
two detectives, Sullivan and DuBois, both of whom were wearing
plain clothes, were present in the hospital room with Hardy.
See Hughes, 640 F.3d at 436 (finding no custodial interrogation
where two plain clothes agents questioned the defendant in a
small house while two uniformed officers waited outside the
room).

Third, the officers did not physically restrain Hardy in
any way during the hospital interviews.  Although Hardy may have
been confined to her hospital bed because of her injury, that
restriction does not weigh in favor of a finding that she was in
custody.  See, e.g., United States v. Jamison, 509 F.3d 623, 629
(4th Cir. 2007) ("In dissecting the perceptions of such a
reasonable person . . . we must be careful to separate the
restrictions on his freedom arising from police interrogation
and those incident to his background circumstances.  That is, to
the extent Jamison felt constrained by his injuries . . . such

limitations on his freedom should not factor into our [custody] analysis.").[20]

Fourth, although the duration of Sullivan and DuBois's interaction with Hardy was lengthy, the nature of the interviews was relaxed and cordial.  Although the record is not entirely clear about the duration of the interviews, the court finds that Hardy was questioned for four hours in the morning and for 90 minutes in the afternoon, with approximately 90 minutes between the two interviews.  Sullivan and DuBois both testified about the nature of their interactions with Hardy, describing them as relaxed and cordial.  At the conclusion of the interviews on June 23, DuBois helped a nurse transport Hardy to surgery and joked with Hardy about the situation.  See Infante, 701 F.3d at 398 (that the defendant shared laughs with the officers supported a finding that the interview was non-threatening); see also Hughes, 640 F.3d at 437 (details such as the officer's politeness and that they never "hectored" the defendant entitled to weight in custody analysis).  Taking into account all of the

---

[20] Although the officers closed the door to Hardy's hospital room at one point, considering the totality of the circumstances, the closing of the door is insignificant.  See, e.g., United States v. Velazquez-Corchado, No. 11-359 (ADC/BJM), 2013 WL 1124678, at *3 (D.P.R. Feb. 26, 2013) (closing door to room where interview took place was not significant to custody analysis) (citing Oregon v. Mathiason, 429 U.S. 492, 494-95 (1977)).

relevant factors, the evidence shows that Hardy was not in custody while at the hospital on June 23 during the interviews.[21]

Hardy argues that regardless of these factors, she was in custody at the hospital because Sullivan and DuBois intended, from the start of their interaction with her, to arrest her eventually.  Although the evidence does not support that conclusion, even if true, such finding would not help Hardy because "the interrogating officer's intent, not communicated to the individual being questioned, is irrelevant to the inquiry." Hughes, 640 F.3d at 435.

The court's conclusion that Hardy was not in custody at the hospital is supported by the First Circuit's decision in Infante, 701 F.3d at 397-98.  In that case, the court of appeals held that a defendant was not in custody when officers questioned him while he was in the hospital.  Id. at 398.  The relevant circumstances included the neutral setting of the hospital room, that Infante went to the hospital of his own

---

[21] In support of her argument that she was in custody at the hospital, Hardy cites Martin, 781 F.2d at 672-74.  Martin does not support Hardy's argument.  In that case, the Ninth Circuit found that the defendant was not in custody while being questioned at a hospital.  Id. at 673.  Although the Ninth Circuit noted in dicta certain circumstances that could support a finding of custodial interrogation in a hospital setting (e.g., police took criminal suspect to hospital from crime scene, monitored hospital stay, and arranged a treatment schedule), those factors are not present here.

accord, that hospital staff came and went freely during the interviews, that the number of officers in the room – two - was not overwhelming, and that the officers did not physically restrain Infante or act in a threatening manner.  Id. at 397-98. The court also noted that "[d]espite having received pain medication, Infante was coherent and responsive, showing no sign of mental impairment."  Id. at 397.  The holding in Infante, which addressed a set of circumstances similar to those presented here, supports a finding that Hardy was not in custody when she was questioned at the hospital.

In light of the totality of circumstances, the court concludes that a reasonable person in Hardy's shoes would have felt free to terminate the June 23 interviews and ask Sullivan and DuBois to leave.  Accordingly, Hardy was not in custody when she made statements to Sullivan and DuBois at the hospital on June 23, 2015.[22]

---

[22] At one point during her interaction with Sullivan and DuBois, Hardy said "maybe I should speak to an attorney."  To the extent Hardy intends to argue that her statement constitutes an invocation of her Miranda right to counsel, such an argument is unavailing.  When an individual is not in custody, "officers [are] not obligated to respect his attempted invocation of [his right to remain silent and to have counsel present]."  Infante, 701 F.3d at 398 (citing United States v. Ellison, 632 F.3d 727, 731 (1st Cir. 2010) ("[E]ven if Ellison had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation.")).

B.    Validity of Miranda Waiver at the MPD

Hardy concedes that she was given Miranda warnings and
waived her rights prior to making statements at the MPD.  She
contends, however, that her waiver was not knowing, voluntary,
and intelligent.

"To protect the Fifth Amendment privilege against self-
incrimination, law enforcement officials must advise suspects in
custody of their Miranda rights prior to any questioning."
United States v. McForbes, 110 F. Supp. 3d 332, 335-36 (D. Mass.
2015) (citing Miranda, 384 U.S. at 478).  An individual may
waive her Miranda rights, but in order to be valid, that waiver
must be (1) voluntary and (2) knowing and intelligent.  United
States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003).  The
government must establish that the defendant validly waived her
Miranda rights by a preponderance of the evidence.  Id.

Hardy concedes that she was advised of and waived her
Miranda rights prior to giving incriminating statements at the
MPD on June 24.  She argues, however, that her waiver was not
valid because it was not voluntary, knowing, and intelligent.

1.    Voluntary

"A waiver is voluntary when it is the product of a free and
deliberate choice rather than intimidation, coercion, or
deception."  United States v. Bezanson-Perkins, 390 F.3d 34, 39

(1st Cir. 2004).  "To determine the voluntariness of a waiver,
it is necessary to look at the totality of the circumstances,
including the tactics used by the police, the details of the
interrogation, and any characteristics of the accused that might
cause his will easily to be overborne." United States v.
Palmer, 203 F.3d 55, 60 (1st Cir. 2000) (citing Arizona v.
Fulminante, 499 U.S. 279, 285 (1991) & United States v.
Rohrbach, 813 F.2d 142, 144 (8th Cir. 1987)) (internal quotation
marks omitted).

The government has shown by a preponderance of the evidence
that Hardy's waiver of her Miranda rights was voluntary.  On
June 23, before leaving the hospital, the detectives explained
to Hardy that if she tried to leave the hospital she would be
arrested.  They also told her that before speaking to her again,
they would provide her with Miranda warnings.  On June 24, Hardy
was discharged from the hospital at 10:38 a.m., she arrived at
the MPD shortly thereafter, and she signed a Miranda waiver form
at 10:58 a.m.  See United States v. Hough, 944 F. Supp. 20, 23
(D.D.C. 1996) (short period of time defendant was in custody
prior to being advised of and waiving his Miranda rights weighed
in favor of finding of voluntary waiver).  Sullivan and DuBois
testified that they explained the form to Hardy, that she
understood it, and that she signed it freely.

Hardy argues that her waiver was not voluntary because she was given pain medication immediately prior to leaving the hospital and because she had been suffering from heroin withdrawal during her hospital stay.  While the evidence shows that Hardy had been administered pain medication at the hospital prior to her discharge, there is no evidence that this medication or any withdrawal symptoms had a negative impact on her mental functioning.  The government produced convincing evidence that Hardy's mental state was not deficient.  DuBois testified that Hardy did not seem to be under the influence of medication while at the MPD, and that she was alert and not slurring her words.  Sullivan, who is an experienced drug investigator, also testified that Hardy did not appear to be suffering from withdrawal symptoms.

The government has met its burden of showing that Hardy's waiver of her <u>Miranda</u> rights was voluntary.

### 2.   Knowing and Intelligent

"A defendant's waiver of the Fifth Amendment privilege is knowing and intelligent where he is advised and understands that he has the right to remain silent and that any statements he makes may be used as evidence against him." McForbes, 110 F. Supp. 3d at 337 (citing Colorado v. Spring, 479 U.S. 564, 574 (1987)).  The court looks at the totality of the circumstances

in order to determine whether the waiver was made with the "requisite level of comprehension." Moran v. Burbine, 475 U.S. 412, 421 (1986).

The government has shown by a preponderance of the evidence that Hardy knowingly and intelligently waived her Miranda rights.  Both Sullivan and DuBois testified that they presented Hardy with a Miranda waiver form and one of them read the form to her.  Sullivan testified that he asked Hardy if she had any questions, and she replied that she did not.  Hardy initialed the form indicating she understood her rights.  Both detectives testified that Hardy appeared to understand the form and did not appear to be either in pain or under the influence of medication.  The evidence unequivocally shows that Hardy knowingly and intelligently waived her Miranda rights.  See, e.g., United States v. Wilson, No. 05-82-P-H, 2006 WL 1314297, at *4 (D. Me. May 12, 2006) (waiver of Miranda rights was voluntary where there was no evidence that defendant was incapable of understanding rights or needed immediate medical attention, and evidence showed that detectives communicated his rights to him in a straightforward manner).

Considering the totality of the circumstances, the court finds that Hardy voluntarily, knowingly, and intelligently waived her Miranda rights before making statements to Sullivan and DuBois on June 24, 2015.

C.   Voluntariness of Hardy's Statements at the Hospital
     and at the MPD

In addition to compliance with Miranda, the government must show that the suspect made his or her statements voluntarily. Hughes, 640 F.3d at 438. "It is elementary that a coerced confession cannot be admitted to prove a defendant's guilt." Id. "The burden rests with the government to prove voluntariness by a preponderance of the evidence." United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990). "When charged with determining whether a confession was voluntary, an inquiring court must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation." Hughes, 640 F.3d at 438. The circumstances the court considers include the following: "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials . . . imposed on the subject." Id. Additionally, the court considers the defendant's attributes, including her mental state. Id.

1.   Hospital Statements

Sullivan and DuBois interviewed Hardy twice while she was at the hospital on June 23 - once in the morning and once in the afternoon. The court finds that, considering the totality of

45

the circumstances, the government has shown that the statements Hardy made during the hospital interviews were voluntary.

As the court noted previously, the length of time the officers spent questioning Hardy was extensive.  The lengthy period of time spent interviewing Hardy does not, however, render her statements involuntary, as the nature of the questioning was not coercive.  See United States v. Jacques, 784 F. Supp. 2d 48, 55 (D. Mass. 2011) (statements were voluntary despite six-and-a-half hour interview) (collecting cases). Sullivan and DuBois were dressed in plain clothes.  They interviewed Hardy in the morning and afternoon, as opposed to at night.  See Hughes, 640 F.3d at 437 (late morning was not a "menacing" time of day).  They questioned Hardy in her hospital room.  Hardy's roommate was present for some portion of the time, and the officers did not ask her roommate to leave.  The detectives did not impede the hospital staff's ability to treat Hardy, nor did they restrict Hardy's access to medical care. Further, there is no evidence that the detectives raised their voices, yelled, or acted aggressively towards Hardy in any way. Sullivan began his interaction with Hardy by telling her that "if she was resting [he and DuBois] would come back another time."  Both detectives testified that their interactions with Hardy were relaxed and cordial.  The nature of the interviews

was not coercive, and weighs heavily in favor of a finding of voluntariness.

Other factors also weigh in favor of finding that Hardy's statements at the hospital were given voluntarily.  Sullivan told Hardy that he would make recommendations to the prosecutor in exchange for Hardy's cooperation, but that he could not make any promises.  Sullivan and DuBois told Hardy that she would likely be arrested at a later date for the drugs found in her apartment, and they did not suggest she would avoid arrest if she cooperated with their investigation.  In addition, there is no evidence that Hardy was deprived of any essentials during her interactions with the detectives at the hospital on July 23.  To the contrary, during both interviews Hardy was being cared for by hospital staff, and the officers did nothing to interfere with that care.

Hardy's situation and personal attributes also do not weigh in favor of suppressing her statements at the hospital.  Hardy argues that her mental state was compromised because she was a shooting victim, on pain medication, and experiencing withdrawal symptoms throughout the relevant time period.  There is no evidence in the record, however, supporting Hardy's argument that these facts compromised her mental state.

To be sure, being the victim of a violent crime is a traumatic experience.  Indeed, the evidence reflects that Hardy

was emotionally upset and in a great deal of pain when she arrived at the hospital.  And, on the morning of June 23, before she made her statements to Sullivan and DuBois, a nurse noted that Hardy was anxious and overwhelmed.  But, Hardy's medical record is also replete with notes that Hardy was alert and coherent.  The medical records further indicate that Hardy was given medication for pain and anxiety.  Although the pain medication given to Hardy can cause confusion, there is no evidence that Hardy was mentally compromised.  Lastly, although Hardy did complain to Berthiaume at mid-day on June 23 that she was experiencing withdrawal symptoms, Berthiaume testified that Hardy's thoughts and speech were "normal," and that Hardy could "communicate effectively."  The court finds that any withdrawal symptoms Hardy was experiencing did not compromise her mental state.

In light of the totality of these circumstances, the court finds that the government has shown by a preponderance of the evidence that Hardy spoke freely with Sullivan and DuBois at the hospital and that her statements at the hospital on July 23 were voluntary.

## 2.   MPD Statements

Hardy argues that her statements on June 24 at the MPD were involuntary for two reasons.  First, Hardy argues that her

statements on June 24 were involuntary because they were the
fruit of her June 23 statements.  Having found that Hardy's June
23 statements were voluntary, the court rejects this argument.
See Hughes, 640 F.3d at 441 ("We already have concluded that his
earlier confession was lawfully obtained.[]  It follows that
there is no poisonous tree.").  Second, Hardy argues that her
MPD statements on June 24 were involuntary because of the long
duration of the interrogation and because Hardy was deprived of
essentials.  This argument merits further discussion.

     While the duration of Hardy's interrogation on June 24 was
extensive, the nature of the interrogation is not indicative of
coercion.  On June 24, after Sullivan and DuBois drove Hardy
from the hospital to the MPD, they debriefed her for
approximately one hour and forty minutes.  Hardy, Sullivan, and
DuBois then spent the rest of the day, until 8:45 p.m., waiting
around at the MPD trying to set up a drug delivery.  Sullivan
and DuBois testified that their interaction with Hardy on June
24 was "very relaxed."  Thus, while Hardy spent a large amount
on time at the MPD, not all of that time was spent answering
questions from the detectives.  Further, the evidence shows that
the nature of the interrogation was not coercive.

     In addition, there is no evidence that Sullivan and DuBois
made any promises to Hardy or threatened her.  The court also
finds that Sullivan and DuBois did not deprive Hardy of any

essentials.  During Hardy's time at the MPD that day, the detectives offered Hardy food, which she refused.  They also took her outside for cigarette breaks.

Hardy argues that Sullivan and DuBois deprived her of clothing, the ability to follow her discharge instructions, and pain medication.  When Hardy was released from the hospital, the detectives requested a pair of scrubs for Hardy to wear because the MPD had taken her clothing as evidence on the night of the shooting.  While Hardy would have been more comfortable in her own clothing, the court does not find that wearing scrubs instead of her own clothing amounts to depriving Hardy of an essential.

At the hearing, Hardy made much of the fact that her discharge instructions included a recommendation that she ice and elevate her hand.  Hardy asserts that Sullivan and DuBois did not provide her with ice for her hand or an opportunity to elevate it.  Sullivan and DuBois testified, however, that they were not aware of the recommendation and that Hardy never asked them for ice.  Had Hardy asked for ice and been refused, she would have a stronger argument.  In the absence of any information about Hardy's need for ice, the court cannot find that Sullivan and DuBois deprived Hardy of an essential.  Nor does Hardy explain how the detectives prevented her from elevating her hand.

Hardy's argument that the officers failed to fill her prescription for pain medication is equally unavailing.  While the officers did refuse to fill Hardy's prescription for pain medication because of MPD policy, they asked Hardy about her pain throughout the day.  Hardy told them that her pain was "not too bad."

Accordingly, the court finds that the government has shown by a preponderance of the evidence that Hardy's statements on June 24, 2015 were voluntary.


**CONCLUSION**

For the foregoing reasons, Hardy's and Stuart-Holt's motions to suppress evidence seized during searches of their apartment (doc. nos. 20 and 22), and Hardy's motion to suppress statements she gave to officers at the hospital and at the MPD (doc. no. 19) are denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 25, 2016
cc:   Philip H. Utter, Esq.
      Charles F.A. O'Leary, Esq.
      Jaye Rancourt, Esq.
      Georgiana L. Konesky, Esq.
      Donald A. Feith, Esq.
      U.S. Probation
      U.S. Marshal